**No. 26-**

# In the United States Court of Appeals for the Ninth Circuit

In re: SZ DJI TECHNOLOGY CO., LTD., and DJI SERVICE LLC,

*Petitioners*,

*v.*

FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,

*Respondents.*

On Petition for Review of an Order of the Federal Communications Commission

## PETITION FOR A WRIT OF MANDAMUS

TRAVIS LEBLANC
ELIZABETH B. PRELOGAR
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
(202) 842-7800
tleblanc@cooley.com
eprelogar@cooley.com

*Counsel for Petitioners SZ DJI Technology Co., Ltd. and DJI Service LLC*

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner respectfully requests oral argument. This petition presents important questions concerning an agency's ability to effectively deny judicial review of a staff-level decision that imposes significant consequences by simply delaying full agency review. The FCC's position would allow agencies to insulate their decisions from review while inflicting ongoing, unrecoverable harms on regulated entities. Thus, the resolution of this petition will have a significant impact on how agencies function going forward, and oral argument would materially aid the Court's decisional process.

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT .................................. i

INTRODUCTION .................................................................. 1

STATEMENT OF JURISDICTION ............................................ 3

STATEMENT OF THE ISSUE .................................................. 4

BACKGROUND ...................................................................... 4

A. DJI and Its Products ........................................................ 4

B. The Secure Networks Act and the FY2025 NDAA ................ 7

C. The Listing of DJI's Products ............................................ 9

D. DJI's Petition for Reconsideration .................................... 11

REASONS FOR GRANTING THE WRIT ................................ 13

I. This Court Should Direct the Commission to Decide DJI's Pending Petition for Reconsideration. .......................................... 14

A. The FCC's Delay Is Inconsistent with a Rule of Reason. ..... 15

B. There Is No Defensible Justification for Delay. .................. 19

1. The FCC Takes the View That Its Duty to Update the Covered List is Ministerial and Non-Discretionary ............................ 20

2. The Public Comment Period Does Not Justify the FCC's Delay. ............................................................ 23

C. DJI and its Consumers Suffer Harm Every Day as a Result of the Bureau-Level Decision. .................................... 27

D. The Commission's Delay Deprives DJI of Any Meaningful Opportunity for Review. .................................... 31

**TABLE OF CONTENTS**
(continued)

**Page**

II. This Court Should Direct the Commission To Properly Interpret the Secure Networks Act and the FY2025 NDAA. ........ 33

A. The Commission Must Determine Whether It Has Received the Requisite National Security Determination. ........ 33

B. The Assessment the Bureau Relied on Is Not a Qualifying National Security Determination. ........ 35

III. This Court Should Direct the Commission to Decide DJI's Pending Requests for Authorization of Non-Drone Products. ........ 39

RELIEF SOUGHT ........ 43

STATEMENT OF RELATED CASES ........ 44

CERTIFICATE OF COMPLIANCE ........ 45

CERTIFICATE OF SERVICE ........ 46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Am. Rivers & Idaho Rivers United*,
372 F.3d 413 (D.C. Cir. 2004) .......... 19

*In re Cal. Power Exch. Corp.*,
245 F.3d 1110 (9th Cir. 2001) .......... 3, 15

*China Unicom (Americas) Operations Ltd. v. FCC*,
124 F.4th 1128 (9th Cir. 2024) .......... 19

*Confederated Tribes of Umatilla Indian Rsrv. v. Bonneville Power Admin.*,
342 F.3d 924 (9th Cir. 2003) .......... 3

*In re Core Commc'ns, Inc.*,
531 F.3d 849 (D.C. Cir. 2008) .......... 27

*FCC v. Brown*,
2026 WL 3080098 (U.S. Oct. 14, 2026) .......... 22-23

*Hikvision USA, Inc. v. FCC*,
97 F.4th 938 (D.C. Cir. 2024) .......... 9

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 32

*Martin v. O'Rourke*,
891 F.3d 1338 (Fed. Cir. 2018) .......... 15

*Michigan v. EPA*,
576 U.S. 743 (2015) .......... 26

*In re Nat. Res. Def. Council, Inc.*,
956 F.3d 1134 (9th Cir. 2020) .......... 15, 28

*NFIB v. OSHA*,
595 U.S. 109 (2022) .......... 34

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*NRCC v. Brown*,
2026 WL 2618462 (U.S. Sept. 4, 2026) .......... 22

*Ralls Corp. v. CFIUS*,
758 F.3d 296 (D.C. Cir. 2014) .......... 27

*Vaz v. Neal*,
33 F.4th 1131 (9th Cir. 2022) .......... 14-15

*Vietnam Veterans of Am. v. CIA*,
811 F.3d 1068 (9th Cir. 2016) .......... 33

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......... 43

## Statutes

47 U.S.C.
§ 155(c)(4) .......... 14
§ 302a(b) .......... 8, 39
§ 402(a) .......... 4
§ 1302(d)(1) .......... 41
§ 1601 .......... 9, 34
§ 1601(a) .......... 7, 14, 41
§ 1601(b) .......... 7, 14
§ 1601(b)(1) .......... 7, 34, 36
§ 1601(c) .......... 7, 14, 24
§ 1601(c)(1) .......... 38
§ 1601(c)(1)-(4) .......... 7
§ 1601(c)(4) .......... 38
§ 1601(d)(2) .......... 16
§ 1601(d)(3) .......... 16-17
§ 1608(1) .......... 41
§ 1608(2) .......... 25, 37
§ 1608(4) .......... 41

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Secure Networks Act, Pub. L. No. 116-124, 134 Stat. 158 (2020) ........... 7

Servicemember Quality of Life Improvement and National Defense Authorization Act for Fiscal Year 2025, Pub. L. No. 118-159, 138 Stat. 1773 (2024)
§ 1709 .......... 38
§ 1709(a)(1) .......... 8, 24, 34, 37-38, 41
§ 1709(a)(1)(A) .......... 8, 41
§ 1709(b)(1) .......... 8
§ 1709(b)(1)(A) .......... 8, 35
§ 1709(c)(1) .......... 37

**Regulations**

47 C.F.R.
§ 1.104(b) .......... 11, 14
§ 1.106(g) .......... 23
§ 1.106(h) .......... 23
§ 1.50001(a) .......... 42
§ 2.901 .......... 8, 39
§ 2.903 .......... 9
§ 2.903(a) .......... 40
§ 2.907(c) .......... 41

91 Fed. Reg. 5245 (Feb. 5, 2026) .......... 12

**FCC Decisions**

*In re China Unicom (Americas) Ltd.*, DA 25-453, 40 FCC Rcd 3335 (2025) .......... 19

*In re Gillian Sutton Station DKRSN(AM)*, FCC 24-20, 39 FCC Rcd 1860 (Feb. 13, 2024) .......... 18

*In re Huawei Designation*, FCC 20-179, 35 FCC Rcd 14435 (2020) .......... 18

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Korean Gospel Broad. Network, Application for New FM Translator Station*, FCC 20-168, 35 FCC Rcd 13633 (Nov. 24, 2020) .......... 18

*In re Protecting Against Nat'l Sec. Threats to the Commc'ns Supply Chain Through the Equip. Authorization Program*, FCC 22-84, 37 FCC Rcd 13493 (2022) .......... 21, 42

*In re Protecting Against Nat'l Sec. Threats to the Commc'ns Supply Chain Through FCC Programs*, FCC 20-176, 35 FCC Rcd 14284 (2020) .......... 20

*In re Ravi's Import Warehouse, Inc.*, FCC 22-10, 37 FCC Rcd 1575 (Jan. 27, 2022) .......... 18

*In re WHKA FM 87.7 Inc*, FCC 26-36, 41 FCC Rcd ____ (May 19, 2026) .......... 18

*In re ZTE Designation*, DA 20-1399, 35 FCC Rcd 13146 (2020) .......... 18

**FCC Public Notices**

FCC Public Notice, DA 24-712, *Public Safety & Homeland Security Bureau Announces Update to List of Covered Equipment and Services* (July 23, 2024) .......... 18

FCC Public Notice, DA 26-278, *FCC's Public Safety & Homeland Security Bureau Announces Addition of Routers Produced in Foreign Countries to FCC Covered List* (Mar. 23, 2026) .......... 18

FCC Public Notice, DA 26-673, *FCC's Public Safety & Homeland Security Bureau Announces Addition of Certain Services of Digitalsystem Technology Inc. to FCC Covered List* (July 7, 2026) .......... 18

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

FCC Public Notice, DA 26-786, *FCC's Public Safety & Homeland Security Bureau Announces Addition of Foreign-Produced Power Inverters and Advanced Robotic Devices to FCC Covered List* (July 28, 2026) .......... 17-18

FCC Public Notice, DA 26-1106, *The Public Safety and Homeland Security Bureau Places into the Record of Two Proceedings Certain Letters from the U.S. Department of War to Congress* (Oct. 14, 2026) .......... 25-26

**FCC Filings**

Chesterfield Cnty. Pub. Safety UAS Program, *Position Statement on the Operational Necessity of DJI Airframes for Public Safety UAS Operations*, OET No. 26-22 (May 13, 2026) .......... 30

Deputy Chris Giacomini, Spokane Cnty. Sheriff's Off., *Preserving Access to DJI Drones for Public Safety Operations*, OET No. 26-22 (Aug. 27, 2026) .......... 29

Glenn Labay, Aerial Camera Servs., *Business Impact Statement & Fact Sheet*, OET No. 26-22 (May 11, 2026) .......... 31

James A. Sims, Ala. Ass'n of Rescue Squads, *Opposition to Proposed December 2025 Ban on Foreign-Made UAS*, OET No. 26-22 (Apr. 23, 2026) .......... 29

Jason Saladin, Higher Side Media LLC, *Comment*, OET No. 26-22 (May 8, 2026) .......... 30

Mark Patrick Collins, DroneXperts, *In Response to the Opportunity for Comment on Ex Parte Filing by SZ DJI Technology Co., Ltd.*, OET No. 26-22 (Aug. 26, 2026) .......... 30

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*In re SZ DJI Tech. Co.*,
ET Dkt. No. 26-22 (FCC Jan. 21, 2026) .......... 11

**Other Authorities**

Black's Law Dictionary (12th ed. 2024) .......... 35

Bruce Einhorn & Allyson Versprille, *Police Concerned About the Ban on Chinese-made Drones*, L.A. Times (Dec. 18, 2025) .......... 5-6

DJI ViewPoints Team, *What's Going on with DJI in the U.S.?*, ViewPoints (Nov. 20, 2025) .......... 9

FCC, *May 2026 Open Commission Meeting* (May 20, 2026) .......... 21

*The Impact of Drones on Law Enforcement Nationwide*, Law Enf't Drone Ass'n .......... 5

Jaclyn Diaz, *U.S. Restrictions on Chinese Drones are Hurting Cash-strapped Police Departments*, NPR (Oct. 12, 2026) .......... 5-6

Kyle Simchuk, *DJI Drone Ban Could Raise Costs, Limit Capabilities for Arizona Firefighters*, ABC 12 News (Dec. 9, 2025) .......... 6

Letter from Adam Walsh to Secretary Kristi Noem et al. (Mar. 3, 2025) .......... 9

## INTRODUCTION

This case concerns the Federal Communications Commission's (FCC or the Commission) attempt to shield a far-reaching, unlawful decision from any judicial check by refusing, for nearly a year, to issue a ruling that the agency says is DJI's only path to court. Mandamus is warranted to direct the agency to act and to end this blatant subversion of due process.

In December 2025, a staff-level FCC decision banned certain new products produced by SZ DJI Technology Co., Ltd. and its affiliates (collectively, DJI) from being marketed in or imported into the United States. That agency action was effective immediately and has been incredibly harmful to DJI and its users: DJI estimates that it will lose hundreds of millions of dollars this calendar year (and potentially far more due to lost research and development opportunities), and American first responders, energy companies, and businesses that rely on DJI's industry-leading drone technology have been unable to purchase new products. And although the staff decision was limited to drone, video surveillance, and communications equipment, the FCC has used the decision as a reason to revoke DJI's earlier authorizations to import other

products and has refused to approve authorizations for any DJI equipment going forward. DJI promptly sought reconsideration of these FCC actions on the grounds that they violate the Constitution and federal law.

Almost one year later, the agency maintains that DJI cannot obtain any judicial review of the staff decision unless and until the full Commission acts on DJI's petition for reconsideration. But the full Commission still has not acted, even though DJI requested reconsideration almost ten months ago and even though the Commission has previously stated that it views its role in banning these products as ministerial and non-discretionary. As a result, the FCC has so far succeeded in insulating its action—however unlawful—from judicial review.

In these extraordinary circumstances, mandamus relief is warranted to direct the full Commission to act. Mandamus is appropriate where an agency's duty to act is clear, and the agency has unreasonably delayed in performing that duty. And here, the Commission has a duty to address petitions for reconsideration of staff-level decisions, and its delay in performing that function has been egregious. The FCC's

governing statutes make clear that Congress expected the Commission to act quickly when imposing or lifting bans on the sale of products in U.S. markets. And the Commission has explicitly stated that its role in this process is purely ministerial and that the Commission exercises no discretion once a national security agency decides that a particular product should be banned. Because the sole, apparent function of the agency's delay is "to frustrate the court's role of providing a forum for review," mandamus is warranted. *In re California Power Exch. Corp.*, 245 F.3d 1110, 1124 (9th Cir. 2001).

## STATEMENT OF JURISDICTION

This Court has jurisdiction under the All Writs Act "to issue mandamus relief necessary to protect [the Court's] 'prospective jurisdiction.'" *California Power Exch. Corp.*, 245 F.3d at 1119 (quoting 28 U.S.C. § 1651). "Because the statutory obligation of a Court of Appeals to review on the merits may be defeated by an agency that fails to resolve disputes," this authority includes the power to "resolve claims of unreasonable [agency] delay" where the statute commits review of the relevant action to the courts of appeals. *Confederated Tribes of Umatilla Indian Rsrv. v. Bonneville Power Admin.*, 342 F.3d 924, 930 (9th Cir.

2003) (quoting *Telecomm. Rsch. & Action Ctr. v. FCC* ("TRAC"), 750 F.2d 70, 75-77 (D.C. Cir. 1984)). Here, Section 402(a) of the Communications Act of 1934 commits review of the Commission's orders to the courts of appeals. *See* 47 U.S.C. § 402(a). Accordingly, this Court has jurisdiction to compel the Commission to issue a final order on DJI's petition for reconsideration.

## STATEMENT OF THE ISSUE

Whether this Court should issue a writ of mandamus compelling the Commission to issue a final order on DJI's petition for reconsideration, when the governing statutes contemplate quick review, the Commission has already stated that it lacks discretion to depart from the staff-level decision, the staff-level decision is imposing grave harms, and DJI cannot otherwise obtain review of the agency action.

## BACKGROUND

### A. DJI and Its Products

DJI is the largest privately owned manufacturer of recreational and commercial drones in the world, with several U.S. affiliates that together employ technicians and other personnel who provide services in connection with drones sold in North America. DJI's products offer the

best technology on the market—from high-resolution cameras and sensors, to superior flight stability and agility, to advanced safety features—at affordable prices compared to foreign and domestic competitors. As a result, DJI has become the preferred drone brand for state and local government agencies and businesses around the country.

Police departments, fire departments, and other first responders in the United States frequently use DJI drones to enhance emergency response times, reduce operational costs, and improve decision-making. Up to "90% of law enforcement agencies flying drones use DJI devices."[1] And surveys show that "drones have helped at least 90% of law enforcement agencies nationwide save a life or improve public safety."[2] DJI drones also allow fire departments to "survey burning buildings" and determine the best course of action from a safe distance.[3] Non-DJI drones often have inferior camera technology and are "really

[1] Jaclyn Diaz, *U.S. Restrictions on Chinese Drones are Hurting Cash-strapped Police Departments*, NPR (Oct. 12, 2026), https://perma.cc/8EUB-KHPN.

[2] *The Impact of Drones on Law Enforcement Nationwide*, Law Enf't Drone Ass'n, https://perma.cc/5BAU-R4Y3.

[3] Bruce Einhorn & Allyson Versprille, *Police Concerned About the Ban on Chinese-made Drones*, L.A. Times (Dec. 18, 2025), https://perma.cc/TB4P-23F4.

useless . . . when it comes to actually firefighting[.]" *Id.* Thus, DJI drones have become "as essential as fire trucks" to fire departments in "rural communities" that often "depend on drones instead of helicopters for overhead support."[4] These departments credit DJI drones with saving lives.[5]

The popularity of DJI's products can be attributed in part to their safety and to the security they provide for user data. For example, DJI was the first major civilian drone manufacturer to implement geofencing, a feature that keeps drones away from restricted zones like airports. And DJI offers several modes that prevent data from being transmitted to outside servers, while still allowing users to operate their equipment.

In addition to drones, DJI also derives significant business from its manufacturing and sale of other products, including handheld cameras, microphones, and portable power stations.

---

[4] Kyle Simchuk, *DJI Drone Ban Could Raise Costs, Limit Capabilities for Arizona Firefighters*, ABC 12 News (Dec. 9, 2025), https://perma.cc/YK7F-XZQ4.

[5] *Id.*; Diaz, *supra*, note 1.

### B. The Secure Networks Act and the FY2025 NDAA

In 2020, Congress enacted the Secure and Trusted Communications Networks Act (Secure Networks Act), which directs the FCC to maintain a list of "covered communications equipment and services" that pose a national security risk (Covered List). 47 U.S.C. § 1601(a); *see* Pub. L. No. 116-124, 134 Stat. 158 (2020) (codified as amended at 47 U.S.C. §§ 1601-1609).

Under the Secure Networks Act, the FCC "shall place" communications equipment or services on the Covered List "if and only if" "such equipment or service . . . poses an unacceptable risk to the national security of the United States or the security and safety of United States persons." 47 U.S.C. § 1601(b), (b)(1). In determining whether that requirement is satisfied, the Commission is permitted to act "solely" if it receives a "specific determination" from one of four enumerated sources: an "executive branch interagency body with appropriate national security expertise," the Department of Commerce, the 2019 National Defense Authorization Act, or "an appropriate national security agency." *Id.* § 1601(c), (c)(1)-(4).

The National Defense Authorization Act for Fiscal Year 2025 (FY2025 NDAA) expanded on the composition of the Covered List in a manner explicitly targeting DJI. *See* Pub. L. No. 118-159, 138 Stat. 1773 (2024). As relevant here, Section 1709(a)(1) of the FY2025 NDAA directs that "[n]ot later than one year after the date of the enactment of this Act, an appropriate national security agency shall determine" if "[c]ommunications or video surveillance equipment . . . produced by . . . DJI Technologies" "pose an unacceptable risk to the national security of the United States or the security and safety of United States persons." *Id.* § 1709(a)(1), (a)(1)(A), 138 Stat. at 2209-10. If the "appropriate national security agency determines that any of the communications equipment or services . . . present an unacceptable risk," then the "Commission shall place such communications equipment or services on the covered list." *Id.* § 1709(b)(1), (b)(1)(A), 138 Stat. at 2210.

The addition of a manufacturer's products to the Covered List carries significant consequences. A manufacturer cannot import, sell, or ship radio frequency devices into the United States without first obtaining an equipment authorization from the FCC. *See* 47 U.S.C. § 302a(b); *see also* 47 C.F.R. 2.901 *et seq.* And the FCC's rules preclude

the issuance of equipment authorizations for devices that are added to the Covered List. *See* 47 U.S.C. § 1601 note; *see also* 47 C.F.R. § 2.903. Accordingly, once a product is added to the Covered List, it can no longer be "marketed in or imported into the United States." *Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 942 (D.C. Cir. 2024).

### C. The Listing of DJI's Products

After the FY2025 NDAA's enactment, DJI made clear to the public and to the Executive Branch that it welcomed the opportunity to explain to an appropriate national security agency that its top-of-the-line products are safe in every respect. On March 3, 2025, for example, DJI's then-head of global policy sent a letter to five Executive Branch leaders explaining that DJI "welcome[d]" any agency to fully and fairly investigate whether DJI's products pose a safety or security risk in the United States.[6] DJI never received a response.

Instead, on December 22, 2025, the Public Safety and Homeland Security Bureau (Bureau), a staff-level office within the FCC, issued a

[6] *See* Letter from Adam Walsh to Secretary Kristi Noem et al. (Mar. 3, 2025), https://perma.cc/P9CC-K7QE; DJI ViewPoints Team, *What's Going on with DJI in the U.S.?*, ViewPoints (Nov. 20, 2025), https://perma.cc/X92Q-REPW.

public notice updating the Covered List. As part of that notice, the Bureau added to the List all "uncrewed aircraft systems (UAS)" –i.e., drones—"and UAS critical components produced in foreign countries," as well as "all communications and video surveillance equipment and services listed in Section 1709(a)(1) of the [FY2025 NDAA]." APPX001-003.

The Bureau made these additions based on a purported national security assessment issued the day before "by an Executive Branch interagency body with appropriate national security expertise." APPX001. Even though that assessment did not mention DJI or analyze any DJI products, the Bureau found that the assessment was "a specific determination of an unacceptable risk to the national security of the United States or the security or safety of United States persons pursuant to" the Secure Networks Act and the FY2025 NDAA. APPX002. The Bureau concluded that the Commission was "required to place [DJI's] equipment and services . . . on the Covered List." APPX002.

The Commission subsequently notified Telecommunications Certification Bodies (TCB), organizations authorized by the FCC to issue equipment authorizations, that the agency was setting aside equipment

authorizations for 19 existing DJI products, including several non-drone products, pursuant to the Listing. DJI has since attempted to obtain reauthorization of the non-drone products subject to the set-asides, as well as authorizations of several new non-drone products. The FCC has failed to act on any of those pending applications and has precluded DJI from filing further requests for authorization of non-covered products.

As a result of the Listing and the associated set-asides, DJI estimates that it will suffer hundreds of millions of dollars in lost revenue in 2026 alone. DJI has also had to abandon many of its planned research and development projects—and forgo additional revenue associated with those projects—in the wake of the ban.

### D. DJI's Petition for Reconsideration

On January 21, 2026, in accordance with the FCC's rules, *see* 47 C.F.R. § 1.104(b), DJI petitioned the full Commission for reconsideration of the Bureau's decision. *See* Pet. for Recons., *In re SZ DJI Tech. Co.*, ET Dkt. No. 26-22 (FCC Jan. 21, 2026), https://perma.cc/VV7H-6LHP. The petition requested "prompt[]" relief, arguing that the Listing and associated set-asides exceeded the Commission's statutory authority and violated DJI's due process rights. The FCC invited the public to comment

on DJI's petition by April 6, and DJI filed a reply to those comments on May 11. *See* 91 Fed. Reg. 5245 (Feb. 5, 2026).

Because DJI and its consumers were suffering harm every day that the Listing remained in effect and because there were open questions as to the deadline to seek judicial review, DJI filed a petition for review in this Court on February 20, 2026. DJI proposed that the parties jointly seek to hold that case in abeyance to allow the full Commission to act on DJI's petition, but the Commission rejected that proposal. Instead, the Commission moved to dismiss, arguing that this Court lacks jurisdiction to review the Listing until the petition for reconsideration is "reviewed and decided" by the "full Commission." Resp't Mot. to Dismiss at 2, *DJI v. FCC*, No. 26-1029 (9th Cir. Mar. 6, 2026), Dkt. 17. The Court ultimately granted DJI's request to hold the case in abeyance until November 2026, presumably with the expectation that the Commission would act on DJI's petition for reconsideration during this period. *See* Order, *DJI v. FCC*, No. 26-1029 (May 28, 2026), Dkt. 25. While that abeyance was still in effect, the Commission renewed its motion to dismiss on October 16, 2026, reiterating its view that this Court lacks jurisdiction to review the Listing unless and until the full Commission

acts. *See* Resp't Renewed Mot. to Dismiss at 23-25, *DJI v. FCC*, No. 26-1029 (Oct. 16, 2026), Dkt. 27. DJI intends to ask this Court to continue the abeyance period during the pendency of this mandamus petition and, if mandamus is granted, until the FCC acts.

## REASONS FOR GRANTING THE WRIT

Mandamus relief is warranted here. The Commission has refused to decide DJI's petition for reconsideration for almost ten months, leaving in place a December 2025 Bureau-level decision that imposes significant consequences on DJI while denying DJI the opportunity to seek judicial review of that decision. There is no reasonable justification for the Commission's delay: the Commission has already made clear that it believes it has no discretion to decide whether DJI's products should be added to the Covered List and that its role in updating the List is purely ministerial. And every day, the Bureau-level decision gravely harms DJI and its consumers, including law enforcement officers and other first responders. This Court should not permit the agency to deprive DJI of judicial review simply by sitting on the petition. At a minimum, this Court should grant mandamus relief to order the Commission to decide DJI's pending authorizations requests, which have nothing to do with the

drone-based concerns that animated the interagency national security assessment.

## I. This Court Should Direct the Commission to Decide DJI's Pending Petition for Reconsideration.

This Court should direct the Commission to promptly resolve DJI's petition for reconsideration. Mandamus relief is appropriate where an agency "has a 'clear, certain, and mandatory duty'" and "has unreasonably delayed in performing such duty." *Vaz v. Neal*, 33 F.4th 1131, 1135-36 (9th Cir. 2022) (citation omitted). Here, the Commission has a duty to decide all applications for review and petitions for reconsideration. *See* 47 U.S.C. § 155(c)(4) ("[E]very such application [for review] shall be passed upon by the Commission."); *see* 47 C.F.R. § 1.104(b) (stating that petitions for reconsideration will be decided). And the Commission likewise has a duty to publish and update the Covered List. *See* 47 U.S.C. § 1601(a)-(d).

The only question is whether the Commission's near-ten-month delay in adjudicating DJI's petition is unreasonable. It clearly is. In assessing agency delay, this Court considers several factors, including: whether the agency's decision-making timeline is consistent with a "rule of reason," whether there are justifiable reasons for the agency's delay,

and whether there are significant "interests prejudiced by the delay." *California Power Exch. Corp.*, 245 F.3d at 1124 (citation omitted). The FCC has delayed almost ten months in addressing a petition that according to the Commission has only one possible outcome. Each day the Commission sits on the petition, DJI and its consumers suffer harm from a Bureau-level decision that took immediate effect but that the agency says lacks the force of law and thus cannot be challenged. This situation is unreasonable under any sense of the term.

### A. The FCC's Delay Is Inconsistent with a Rule of Reason.

The Commission's delay in resolving DJI's petition is inconsistent with a "rule of reason"—"[t]he most important" factor in assessing an agency's delay. *In re Nat. Res. Def. Council, Inc.*, 956 F.3d 1134, 1139 (9th Cir. 2020) (citation omitted). A rule of reason analysis necessarily requires examination of "the particular agency action for which unreasonable delay is alleged." *Martin v. O'Rourke*, 891 F.3d 1338, 1345 (Fed. Cir. 2018). And a statutory scheme may "supply content for this rule of reason" "where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed." *Vaz*, 33 F.4th at 1137 (quoting *TRAC*, 750 F.2d at 80). In this case, both the

statutory scheme and the FCC's past practice supply content for the relevant rule of reason and demonstrate that the Commission's delay in adjudicating DJI's petition is unacceptable.

To start, the Secure Networks Act, the statute that authorizes the FCC to update and maintain the Covered List, clearly contemplates that the Commission will act quickly to determine whether entities should be added to or removed from the List. In particular, the Act directs the Commission to "monitor the making or reversing of the [national security] determinations" and to update the List to "place additional communications equipment or services on the list" or "to remove communications equipment or services from such list" as needed. 47 U.S.C. § 1601(d)(2). The Act further provides that "[f]or each 12-month period during which the list . . . is not updated, the Commission shall notify the public that no updates were necessary during such period to protect national security or to address changes in the determinations." *Id.* § 1601(d)(3).

That language makes clear that Congress expected the Commission to keep track of national security determinations throughout the year and to update the List promptly upon receipt of a new determination. In

a year with no new determinations, Congress mandated that the FCC update the public, notifying them that no changes to the List were necessary. *See* 47 U.S.C. § 1601(d)(3).

It makes sense that Congress would have wanted the Commission to act with alacrity in this context. When an expert agency has a well-founded national security concern about an entity's product, it is reasonable to expect the FCC to act quickly to ensure that the product is added to the List and that it can no longer be imported or sold in the United States. But it is equally reasonable to expect the FCC to quickly remove an erroneous designation: a Covered List designation imposes an immense hardship on the designated entity and its U.S. consumers, *see supra* at 8-9, and there is no basis for imposing that hardship if it proves not to reflect any valid national security concerns.

The agency's past practice confirms the point and further demonstrates the unreasonableness of the agency's delay. In the last two years, the Bureau has routinely updated the Covered List within three months of receiving a relevant national security determination.[7] And the

[7] *See, e.g.*, FCC Public Notice, DA 26-786, *FCC's Public Safety & Homeland Security Bureau Announces Addition of Foreign-Produced Power Inverters and Advanced Robotic Devices to FCC Covered List* (July

agency has previously decided petitions for reconsideration of Covered List determinations in under six months.[8] Even the full Commission has regularly decided applications for review of Bureau decisions within a year.[9] These examples confirm that the Commission is capable of reaching Covered List decisions far more quickly than it has moved here and that the agency's delay is "uncharacteristic of the relatively swift

---

28, 2026) (one day after determination); FCC Public Notice, DA 26-673, *FCC's Public Safety & Homeland Security Bureau Announces Addition of Certain Services of Digitalsystem Technology Inc. to FCC Covered List* (July 7, 2026) (three months after determination); FCC Public Notice, DA 26-278, *FCC's Public Safety & Homeland Security Bureau Announces Addition of Routers Produced in Foreign Countries to FCC Covered List* (Mar. 23, 2026) (three days after determination); FCC Public Notice, DA 24-712, *Public Safety & Homeland Security Bureau Announces Update to List of Covered Equipment and Services* (July 23, 2024) (one month after determination).

[8] *See In re ZTE Designation*, DA 20-1399, 35 FCC Rcd 13146 (2020) (petition for reconsideration filed July 30, 2020; decision issued November 24); *In re Huawei Designation*, FCC 20-179, 35 FCC Rcd 14435 (2020) (petition for reconsideration filed July 30, 2020; decision issued December 11).

[9] *See In re WHKA FM 87.7 Inc*, FCC 26-36, 41 FCC Rcd ____ (May 19, 2026) (eleven months); *In re Gillian Sutton Station DKRSN(AM)*, FCC 24-20, 39 FCC Rcd 1860 (Feb. 13, 2024) (five months); *In re Ravi's Import Warehouse, Inc.*, FCC 22-10, 37 FCC Rcd 1575 (Jan. 27, 2022) (twelve months); *Korean Gospel Broad. Network, Application for New FM Translator Station*, FCC 20-168, 35 FCC Rcd 13633 (Nov. 24, 2020) (nine months).

treatment it routinely gives similar petitions." *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 420 (D.C. Cir. 2004).[10]

In sum, the fact-specific rule-of-reason inquiry weighs in favor of directing the Commission to act. The statutory scheme contemplates expedited resolution of these issues, and the delay in addressing this harmful decision has already outlasted the agency's own practice for resolving comparable petitions by several months. Moreover, as explained, *infra* at 20-23, there can be no deliberative process left to protect where, as here, the agency itself has disclaimed any discretion over the outcome.

### B. There Is No Defensible Justification for Delay.

Even if the governing statutes did not establish any timeline for the agency's resolution of a petition for review, there would be no justifiable reason for the Commission's prolonged delay here. The Commission has

[10] The FCC took longer to decide a petition for reconsideration of a Covered List designation in one recent case. *See In re China Unicom (Americas) Ltd.*, DA 25-453, 40 FCC Rcd 3335, 3339-43 (2025). But that case implicated ongoing Ninth Circuit litigation over the validity of the Executive Branch documents underlying the designation. *See China Unicom (Americas) Operations Ltd. v. FCC*, 124 F.4th 1128 (9th Cir. 2024). And the FCC's final decision was issued just five months after the Ninth Circuit decision.

repeatedly stated that it views its own authority to update the Covered List as ministerial and nondiscretionary, meaning there is nothing whatsoever preventing the full Commission from issuing an order on the petition immediately. And while the agency took public comment on DJI's petition, the FCC cannot explain how that public comment period could affect its supposedly ministerial duty or inform its adjudication of DJI's challenges—all of which are based on the record that was before the Bureau when it first updated the Covered List.

**1. The FCC Takes the View That Its Duty to Update the Covered List Is Ministerial and Non-Discretionary.**

The Commission has consistently characterized its role in updating the Covered List as ministerial and non-discretionary. In its Supply Chain Second Report and Order, for example, the Commission stated that updating the List "'is a non-discretionary, ministerial act.'" *In re Protecting Against Nat'l Sec. Threats to the Commc'ns Supply Chain Through FCC Programs*, FCC No. 20-176, 35 FCC Rcd 14284, 14318 ¶ 75 (2020) (citation omitted). Later, the Commission reaffirmed that "[t]he Secure Networks Act requires the Commission to accept and incorporate on the Covered List the [national security determinations] as provided"

and that it "ha[s] no discretion not to do so." *In re Protecting Against Nat'l Sec. Threats to the Commc'ns Supply Chain Through the Equip. Authorization Program*, FCC No. 22-84, 37 FCC Rcd 13493, 13548 ¶ 144 (2022); *see also* FCC, *May 2026 Open Commission Meeting* at 55:48 (May 26, 2026), https://www.fcc.gov/May2026 (Chairman Carr stating, in relation to the Covered List, that the FCC is "simply implementing" decisions by national security agencies).

The Commission's past statements thus leave no doubt as to its position on the merits of DJI's petition: in the Commission's view, it was bound to add DJI's products to the Covered List as soon it received the interagency assessment and has no authority to deviate from that outcome. Indeed, the FCC confirmed that position in the Public Notice that announced the Listing of DJI's products, observing that the Secure Networks Act and the FY2025 NDAA "do[] not give the Commission discretion . . . to not make any updates to the Covered List if the statutory conditions are satisfied." APPX001-002, & n.9.

This constraint on the agency's authority distinguishes this case from the recent, related sequence of decisions in *FCC v. Brown*. In *Brown*, the Supreme Court stayed a Fourth Circuit judgment that had

asserted jurisdiction over a petition for review filed before the Commission acted on the petitioners' pending application for review. *See NRCC v. Brown*, No. 26A274, 2026 WL 2618462 (U.S. Sept. 4, 2026) (per curiam). After that stay, the same petitioners returned to the Fourth Circuit with a petition under the All Writs Act, this time arguing that the Commission's continued delay in acting on their application was unreasonable. A divided Fourth Circuit panel granted a writ of mandamus directing the Commission to resolve the application within 48 hours, and the Supreme Court stayed that mandamus order as well. *See FCC v. Brown*, No. 26A476, 2026 WL 3080098, at *1 (U.S. Oct. 14, 2026) (per curiam). The Court's stated concern was with the remedy the Fourth Circuit selected (a 48-hour deadline), which forced the Commission to "abandon its deliberation process" while it was evaluating an application that required the interpretation of complex, discretionary campaign-finance rules. *Id.* at *2. Nothing in the opinion holds, or even suggests, that mandamus is unavailable to remedy an agency's unreasonable delay; to the contrary, the Court reaffirmed that mandamus remains warranted when an agency is compelled "to 'perform a ministerial or non-discretionary act' over which the agency has 'no discretion whatever.'"

*Id.* (quoting *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 63-64 (2004)).

DJI's request fits squarely within that carve-out and outside *Brown*'s concerns: DJI does not ask this Court to impose an arbitrarily short, deliberation-foreclosing deadline to resolve an application requiring the agency to exercise interpretive discretion after only a few months' consideration. Instead, this petition asks the Court to direct the Commission to act after nearly a year of total inaction on a petition the Commission itself says requires no deliberation at all. DJI does not ask this Court to dictate the Commission's procedures; it asks only that the Commission be required to timely finish a process that, by the Commission's own account, involves no discretion and no remaining procedural steps.

### 2. The Public Comment Period Does Not Justify the FCC's Delay.

To the extent the Commission attempts to justify its delay based on the comment period, that argument fails. Nothing in the FCC's statutes or regulations requires the agency to conduct a lengthy comment period on a petition. *See* 47 C.F.R. § 1.106(g), (h) (oppositions to petitions are generally due within 10 days and replies seven days thereafter). And it

is hard to see how a comment process could possibly be a reason for delay when the Commission views its Covered List responsibilities as purely ministerial and triggered only by the agency's receipt of a qualifying national security determination. *See supra* at 20-23. The unusually lengthy self-imposed comment period here thus only serves as further evidence that the FCC is deliberately manufacturing delay to deprive DJI of its day in court.

But even setting that aside, the comment period cannot explain the agency's delay because the two fundamental defects identified in the petition cannot possibly be cured or explained away with support from public comments.

First, DJI argued in its petition that the Bureau lacked statutory authority to add DJI's products to the List. The FCC is authorized to add DJI's products to the list "only if": (1) the FCC receives a "specific determination" that a particular product produced by DJI poses an unacceptable risk to national security, 47 U.S.C. § 1601(c), and (2) that determination is issued by "an appropriate national security agency," FY2025 NDAA § 1709(a)(1), 138 Stat. at 2209. The four-page assessment the Bureau relied on in listing DJI's products does not satisfy either

requirement: it contains no particularized analysis of the risks posed by DJI or any of its products, and it was issued by an unidentified interagency body instead of one of the "appropriate national security agenc[ies]" specifically enumerated in the statutes. *See* 47 U.S.C. § 1608(2). Each deficiency independently requires rescission of the Listing, and neither can be cured by comments or other post-hoc explanation of the Commission's reasoning.

Nor can this defect be cured by materials the Commission has recently placed in the record. On October 14, 2026, the Bureau placed into the record redacted cover pages of undated letters from the Department of War to various congressional committees, as well as a letter from Senator Rick Scott to the FCC Chairman objecting to DJI's petition. *See The Public Safety and Homeland Security Bureau Places into the Record of Two Proceedings Certain Letters from the U.S. Department of War to Congress*, FCC Public Notice, DA 26-1106 (Oct. 14, 2026). Neither submission can supply the specific, product-by-product determination the statute requires, and neither bears on whether the December 2025 Listing itself satisfied that requirement: both postdate the Listing by nearly a year, and the Bureau's own Public Notice

expressly states that "we did not rely upon these materials at the time of making any related additions to the Covered List." *Id.* A post hoc submission that the agency itself disclaims having relied upon cannot retroactively cure the absence of a qualifying, product-specific determination at the time the Bureau acted. *See Michigan v. EPA*, 576 U.S. 743, 758-59 (2015) (an agency "must consider" the relevant factors "before deciding," not after). There is thus no basis for the FCC to delay in answering this statutory challenge.

Second, the Bureau's reliance on the interagency assessment was independently improper because it violated DJI's due process rights. The addition of DJI's products to the List deprived DJI of significant liberty interests, threatening its ability to operate the business of its choice, and did so without affording DJI any procedural protections, including the ability to provide information to definitively refute the notion that DJI's products pose any safety or security risk. As with the statutory challenge, nothing about the comment process can provide the requisite constitutional due process because an entity, deprived of its liberty interests, "must receive the procedural protections . . . *before*" the agency

acts. *Ralls Corp. v. CFIUS*, 758 F.3d 296, 320 (D.C. Cir. 2014) (emphasis added).

### C. DJI and its Consumers Suffer Harm Every Day as a Result of the Bureau-Level Decision.

Each day the Commission delays in adjudicating DJI's petition, the Listing is having immediate and harmful effects on DJI and its consumers. These here-and-now injuries weigh strongly in favor of concluding that the Commission has unreasonably delayed in adjudicating DJI's petition. *See In re Core Commc'ns, Inc.*, 531 F.3d 849, 857 (D.C. Cir. 2008) (financial harm to private party supported grant of mandamus).

DJI suffers injury every day the Listing remains in effect. Because of this Bureau-level decision, DJI is legally prohibited from marketing, selling, or importing new communications and video surveillance equipment and services in the United States and is experiencing daily, seven-figure losses as a result. DJI estimates that its total losses since December 2025 are in the hundreds of millions (and likely even higher given that DJI has had to forgo several potentially profitable research and development plans). The listing also damages DJI's reputation, both in the United States and globally, by claiming without any particularized

reasoning that DJI's products pose an unacceptable risk to national security.

The Commission's inaction on DJI's petition for reconsideration, moreover, is not an isolated scheduling lapse; it reflects a broader pattern of unexplained non-responsiveness to DJI's pending submissions. DJI affiliates have separately sought equipment authorizations and related relief for other, plainly non-covered products, and those requests, too, have languished for months without any substantive response or explanation. *See infra* at 39-43. That pattern reinforces that the delay here is not the product of ordinary agency workload but of an agency declining to engage with DJI's pending requests at all.

The impacts of the Bureau's decision are not limited to DJI. DJI's U.S. consumers include law enforcement, other first responders, and private companies, all of whom rely on DJI's industry-leading drones to perform their critical work and all of whom are harmed by virtue of the ban. *In re Nat. Res. Def. Council, Inc.*, 956 F.3d at 1141 (granting mandamus because of impacts on health and human welfare).

For example, many law enforcement organizations in the United States rely on DJI drones to enhance their ability to respond to

emergencies. Law enforcement agencies use drones to, among other things, locate missing children and document crime scenes—"time-critical operations" where quality and reliability is essential. Deputy Chris Giacomini, Spokane Cnty. Sheriff's Off., *Preserving Access to DJI Drones for Public Safety Operations*, OET No. 26-22 (Aug. 27, 2026). DJI drones, in particular, play an important role in these operations. One state association of law enforcement officers explained that its search and rescue operations "rel[y] on drone technology" but that U.S.-made alternatives to DJI's products "do not offer the same performance reliability for nighttime, thermal-imaging, or all-weather search and rescue operations." James A. Sims, Ala. Ass'n of Rescue Squads, *Opposition to Proposed December 2025 Ban on Foreign-Made UAS*, OET No. 26-22 (Apr. 23, 2026). DJI's products balance cost and quality, while "[s]witching to higher-cost, lower-capability American alternatives would diminish public safety agencies' effectiveness and severely strain local budgets." Giacomini, *supra*, at 1. The addition of DJI's products to the Covered List thus results in "longer response times and higher risks to the public." Sims, *supra*, at 1.

Other first responders likewise rely on DJI drones to facilitate their critical work. A training organization for "multiple fire departments and public-safety organizations" has explained that drones help provide emergency services "without unnecessarily exposing personnel to danger." Mark Patrick Collins, DroneXperts, *In Response to the Opportunity for Comment on Ex Parte Filing by SZ DJI Technology Co., Ltd.* at 5, OET No. 26-22 (Aug. 26, 2026). An inability to purchase DJI products not only "significantly degrade[s] emergency response capability, increase[s] costs, and delay[s] lifesaving operations," but also "introduce[s] operational risk by forcing reliance on less-proven systems." Chesterfield Cnty. Pub. Safety UAS Program, *Position Statement on the Operational Necessity of DJI Airframes for Public Safety UAS Operations* at 1-2, OET No. 26-22 (May 13, 2026).

Finally, many private companies depend on DJI products to perform critical business functions. A small business owner in the "film making space" relies on non-drone DJI products like "Gimbals, Portable batteries, Mics, cinema cameras, [and] small vlogging style cameras" that have been impacted by the Covered List determination. Jason Saladin, Higher Side Media LLC, *Comment*, OET No. 26-22 (May 8, 2026). And

one municipal power company uses DJI drones to complete thermal-imaging heat loss analysis to improve "energy efficiency" and assist "working families and fixed-income residents." Glenn Labay, Aerial Camera Servs., *Business Impact Statement & Fact Sheet* at 1, OET No. 26-22 (May 11, 2026). Without DJI's products, these businesses will have "no upgrade path, no reliable repair, and replacement aircraft [will be] either unavailable or unaffordable," forcing business owners to choose between "[f]lying aged, unrepairable thermal aircraft over utility infrastructure, solar installations, occupied warehouses, and residential neighborhoods"—a clear public safety risk—or going out of business. *Id.* at 3.

### D. The Commission's Delay Deprives DJI of Any Meaningful Opportunity for Review.

The Commission's continued delay in deciding DJI's petition has effectively deprived DJI of any meaningful opportunity to seek judicial review in the face of these ongoing harms. Shortly after DJI filed its petition for reconsideration with the Commission, DJI also filed a petition for review with this Court to protect its rights given uncertainty over the timeline for seeking judicial review. In response, the government moved to dismiss the case, arguing that this Court lacks jurisdiction to review

the Listing unless and until the full Commission acts. The government recently renewed that motion to dismiss, reiterating its position that this Court lacks jurisdiction absent an order from the full Commission. *See supra* at 12-13.[11] Thus, in the government's view, mandamus is the only potential vehicle by which a Court can intervene when the Commission sits on a request for review of a Bureau-level decision that is actively harming regulated entities and consumers. *See, e.g.*, Br. for Resp'ts at 28, *Brown v. FCC*, No. 26-1785 (4th Cir. July 20, 2026), Dkt. 49.

To deny mandamus relief in this context would skew the separation of powers by "stripp[ing] courts of judicial power" while "increasing the power of executive agencies." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 416 (2024) (Thomas, J., concurring). If the government's view of the statutory scheme is correct, then nothing—except for mandamus relief—will prevent the Commission from directing injurious action at the staff-level, sitting on the ensuing request for review, and indefinitely denying

[11] The existence of this litigation cannot explain the Commission's delay. Five days after DJI filed its petition for review in this Court, DJI proposed that the parties jointly seek to hold the case in abeyance for six months to allow the FCC to act on DJI's petition. This Court granted that request, and the case has been in abeyance since May 2026. It is thus implausible that any FCC attorney—much less the decisionmakers on DJI's application—have been distracted by litigation in this Court.

any opportunity for judicial review. This Court should not countenance that result, which contravenes fundamental principles of separation of powers and judicial review.

## II. This Court Should Direct the Commission To Properly Interpret the Secure Networks Act and the FY2025 NDAA.

Should the Court order the Commission to address DJI's petition, it should also direct the Commission to properly apply the Secure Networks Act and the FY2025 NDAA. As explained, the Commission has interpreted those statutes to require the agency to automatically update the Covered List whenever it receives a national security determination, without first considering whether that determination complies with statutory requirements. *See supra* at 20-23. That view is incorrect, and this Court should clarify as much when it directs the Commission to rule on DJI's petition. *See Vietnam Veterans of Am. v. CIA*, 811 F.3d 1068, 1080 (9th Cir. 2016) (affirming injunction directing agency to act consistently with regulations when compelling agency action).

### A. The Commission Must Determine Whether It Has Received the Requisite National Security Determination.

The FCC is authorized to add products to the Covered List "if and only if" it receives a national security determination that satisfies the

requirements of the Secure Networks Act and the FY2025 NDAA. *See* 47 U.S.C. § 1601. With respect to DJI's products in particular, those statutes make clear that a qualifying determination must satisfy two requirements: (1) it must be a "specific determination" that a particular product produced by DJI poses an unacceptable risk to national security, 47 U.S.C. § 1601(b)(1); and (2) the determination must be issued by "an appropriate national security agency," FY2025 NDAA § 1709(a)(1), 138 Stat. at 2209.

Under this scheme, the Commission necessarily plays a role in assessing whether the determinations it receives reflect the requisite level of specificity and whether they originate from the requisite sources. The satisfaction of those statutory conditions is what triggers the Commission's authority; the Commission cannot act unless those conditions are satisfied. *Cf. NFIB v. OSHA*, 595 U.S. 109, 117 (2022) (per curiam) (agencies are "creatures of statute" that "possess only the authority that Congress has provided."). If, for example, the Commission received a letter from the Environmental Protection Agency stating that DJI drones were disrupting flight patterns of migratory birds, the Commission would not—and could not—conclude that it was required to

add those drones to the Covered List. And yet there is nothing to prevent that result if the FCC is correct that it lacks any ability to evaluate whether a particular determination meets the statutory criteria.

### B. The Assessment the Bureau Relied on Is Not a Qualifying National Security Determination.

Under the correct understanding of the statutes, the assessment the Bureau relied on does not meet either of the statutory prerequisites for adding DJI's products to the Covered List.

First, the assessment is not the statutorily required "specific determination" of national security risk because it does not analyze the risks associated with a particular product from a particular entity. As a matter of ordinary meaning, a "specific" determination is one that involves "a particular or defined thing." *Specific*, Black's Law Dictionary (12th ed. 2024). And the statutory context confirms that Congress envisioned that a qualifying determination would assess the risks associated with particular communications equipment as produced or provided by particular entities. The FY2025 NDAA focuses explicitly on products from two manufacturers: DJI and Autel Robotics. FY2025 NDAA § 1709(b)(1)(A), 138 Stat. at 2210. And the Secure Networks Act states that equipment or services should be added to the list only when

"*such* equipment or service produced or provided by *such* entity poses an unacceptable risk to the national security of the United States." 47 U.S.C. § 1601(b)(1) (emphasis added). By including the phrase "such equipment or service produced or provided by such entity," Congress plainly directed an individualized entity- and product-specific assessment of risk.

The assessment the Bureau relied on to list DJI's products contains none of the entity- or product-specific analysis required by the statute. Instead, the assessment discusses generally the public safety risks that drones can pose when misused by malevolent actors and the importance of ensuring that the United States has a strong domestic drone base. APPX005-006. The assessment then concludes that all foreign-manufactured UAS and UAS critical components should be added to the Covered List and summarily states that this determination covers "all communications and video surveillance equipment and services listed in Section 1709(a)(1) of the [FY25 NDAA]," including even non-drone products. APPX006. Nowhere does the assessment mention DJI drone or non-drone products, let alone conclude that those products specifically pose an unacceptable risk to national security.

Second, the assessment was not prepared by "an appropriate national security agency." The FY2025 NDAA specifically requires that "an appropriate national security agency" "shall determine" whether DJI's communications or video surveillance equipment pose a risk to national security. FY2025 NDAA § 1709(a)(1), 138 Stat. at 2209. It specifies that "'appropriate national security agency' has the same meaning as the term in Section 9 of the [Secure Networks Act]," *id.* § 1709(c)(1), 138 Stat. at 2210-11, which defines the term to mean five agencies: the Department of Homeland Security; the Department of Defense; the Office of the Director of National Intelligence; the National Security Agency; and the Federal Bureau of Investigation. *See* 47 U.S.C. § 1608(2).

None of those five agencies prepared the interagency assessment relied on by the Bureau to list DJI's products. Instead, the assessment was "made by an Executive Branch interagency body." APPX001. An "Executive Branch interagency body," however, is different from an appropriate national security agency for purposes of the Covered List. Indeed, the Secure Networks Act expressly distinguishes between determinations made by any "executive branch interagency body with

appropriate national security expertise," and "determination[s] made by an appropriate national security agency." 47 U.S.C. § 1601(c)(1), (4). And the Bureau explicitly recognized that "section 1709 requires a determination by an 'appropriate national security agency,' rather than an Executive Branch interagency body." APPX002 n.8.

It makes no difference that the interagency body here purportedly "includ[ed] appropriate national security agencies," APPX001 n.5, or that several of those agencies apparently "concurred in th[e] determination," APPX002 n.8. Had Congress wanted an Executive Branch interagency body to conduct the national security assessment with the concurrence of national security agencies, it would have said so, invoking the Secure Networks Act's definition of "Executive Branch interagency body." But that is not what Congress did. Instead, it expressly directed that "an appropriate national security agency shall" be the entity that determines whether DJI's products pose an unacceptable risk to national security. FY2025 NDAA § 1709(a)(1), 138 Stat. at 2209.

There are good reasons why Congress might choose to assign a particular national security determination to one of the established national security agencies, as opposed to an interagency body. When the

determination is delegated to an agency, there are clear lines of responsibility and accountability, as well as established practices that would lead the agency to at least allow DJI to present its case. Here, in contrast, DJI is not even aware of the full composition of the interagency body that decided its fate behind closed doors. Nor is DJI aware of the decision-making process by which the participating agencies "concurred" in the determination.

## III. This Court Should Direct the Commission to Decide DJI's Pending Requests for Authorization of Non-Drone Products.

At a minimum, this Court should direct the Commission to resolve DJI's pending requests for authorization of its non-drone equipment. As explained, a manufacturer cannot import, sell, or ship radiofrequency devices into the United States without an FCC equipment authorization. *See* 47 U.S.C. § 302a(b); *see also* 47 C.F.R. § 2.901 *et seq*. Before the Listing, the FCC granted authorizations for several of DJI's non-drone products, confirming that those products comply with FCC requirements. Commission staff then set aside those authorizations based on the Listing and returned the applications to pending status (without formally denying them). DJI has since sought reauthorization of the set-aside products as well as authorizations of additional non-drone products,

arguing that these products implicate none of the drone-based concerns described in the national security assessment that the Bureau used to list DJI's products. FCC staff have nonetheless sat on DJI's authorization requests for months, directing DJI to contact the TCBs to obtain reauthorization and then refusing to respond to the TCBs' requests for information. The Commission's inaction has left DJI incapable of selling any of these innovative non-drone products in the United States—and incapable of seeking review of the agency's determination.[12]

There is no reason for the delay in adjudicating these requests. FCC rules preclude the Commission from approving new requests for authorization of equipment that is added to the Covered List*, see* 47 C.F.R. § 2.903(a), but they do not preclude authorization of equipment that is not on the List and that otherwise satisfies FCC requirements. To the contrary, FCC rules explicitly contemplate companies on the Covered

[12] Most recently, in October, a DJI subsidiary sought to file an application for a non-covered device and was blocked from doing so because the FCC had placed the affiliate on "deferred" status, preventing the filing of any applications.

List filing authorization requests for non-covered equipment. *See id.* § 2.907(c).

The non-drone equipment for which DJI has sought authorization, which includes two microphones and a camera, does not fall within the scope of the Covered List and so should be considered for authorization. The FY2025 NDAA and the Secure Networks Act authorize the FCC to add to the Covered List only products that qualify as "communications equipment or services," 47 U.S.C. § 1601(a), or "video surveillance equipment," FY2025 NDAA § 1709(a)(1), (a)(1)(A), 138 Stat. at 2209-10. DJI's non-drone products fit neither definition.

First, as DJI has explained to the FCC, DJI's microphone and camera products are not "communications equipment or services." The statute defines that term to include "any equipment or service that is essential to the provision of advanced communications service," 47 U.S.C. § 1608(4), which, in turn, is defined as "high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology," *id.* § 1302(d)(1); *see id.* § 1608(1). DJI products are not "essential" to broadband networks, as that term is commonly

understood: no broadband network would operate any worse absent DJI's cameras or microphones. That the equipment might be "used in" a broadband network does not mean that it is "essential to," or necessary for, the operation of that network. In fact, the majority of DJI's microphone and camera products do not even connect directly to broadband networks; instead, they rely on a connected mobile phone to transmit data.

Second, DJI's non-drone products also do not qualify as "video surveillance equipment." Consistent with the definition of communications equipment, video surveillance equipment is limited to "equipment that is used in fixed and mobile networks that provides advanced communications service in the form of a video surveillance service." 37 FCC Rcd at 13574-75 ¶¶ 205-06; *see also* 47 C.F.R. § 1.50001(a). And as explained, many of these products do not connect directly with the Internet, meaning they are not independently capable of use in a broadband network.

These limitations on the FCC's authority reflect important constraints. To endorse the FCC's efforts to ban products that are not communications or video surveillance equipment would give the agency

incredible power to adversely affect international commerce and American consumers without any basis in statutory text. This Court should reject that result and order the Commission to act so that DJI may seek review. *See West Virginia v. EPA*, 597 U.S. 697, 722 (2022).

## RELIEF SOUGHT

This Court should grant the petition and direct the full Commission to resolve DJI's petition for reconsideration promptly and to do so consistent with statutory requirements in the Secure Networks Act and the FY2025 NDAA. At a minimum, this Court should direct the Commission to resolve DJI's pending requests for authorization of its non-drone products.

Dated: November 2, 2026

Respectfully submitted,

*/s/ Travis LeBlanc*

TRAVIS LEBLANC
ELIZABETH B. PRELOGAR
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800
tleblanc@cooley.com

*Counsel for Petitioners SZ DJI Technology Co., Ltd. and DJI Service LLC*

## STATEMENT OF RELATED CASES

The undersigned attorney states that I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

- *SZ DJI Technology Co., LTD. and DJI Service, LLC, v. Federal Communications Commission and United States of America*, No. 26-1029 (9th Cir.) (in abeyance)

Dated: November 2, 2026

*/s/ Travis LeBlanc*
Travis LeBlanc

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the type-volume limit of Fed. R. App. P. 21(d) and Circuit Rules 21-2(c) and 32(f) because it contains 8,366 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I also certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook.

Dated: November 2, 2026

*/s/ Travis LeBlanc*
Travis LeBlanc

## CERTIFICATE OF SERVICE

I hereby certify that, on November 2, 2026, this Petition for a Writ of Mandamus was filed via the Court's CM/ECF system, and copy was served via U.S. mail upon the following parties:

Todd Blanche
Attorney General
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Adam Candeub
General Counsel
Federal Communications Commission
45 L Street, NE
Washington, DC 20554

Dated: November 2, 2026

*/s/ Travis LeBlanc*
Travis LeBlanc